Filed 9/27/23  P. v. Cerpa CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAIME CERPA,<br><br>Defendant and Appellant. | F084669<br><br>(Super. Ct. No. 1432625)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Amanda D. Cary and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jaime Cerpa appeals from the trial court's June 29, 2022, denial of his petition to have his felony murder conviction vacated and to be resentenced pursuant to Penal Code former section 1170.95, now section 1172.6.[1]

In 2016, a jury found Jaime Cerpa and three codefendants guilty of the first degree murder of Julio Jimenez (§ 187, subd. (a); count 1); robbery of an inhabited dwelling (§ 212.5, subd. (a); count 2) and robbery of Corina Vargas (§ 211; count 3).[2]  As to each defendant, it was found true that the murder was committed during the course of a robbery and that all defendants were principals in the robbery (§ 189); that the robberies were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); and that a principal in the robberies (Domingo Becerra) personally discharged a firearm causing the death of Jimenez (§§ 12022.7, 12022.53, subds. (d), (e)(1)).  The trial court sentenced Cerpa to a total term of 80 years to life, consisting of 75 years to life for the murder and firearm enhancements, plus a total of five years for the robberies.  Various fines and fees were imposed.

Cerpa appealed and, on March 20, 2019, this court filed an opinion ordering remand for an exercise of discretion regarding firearm enhancements but otherwise affirmed the judgment.  (*People v. Cerpa* (Mar. 20, 2019, F073493) [nonpub. opn.].)

On August 16, 2019, Cerpa filed a petition for resentencing under section 1172.6.  An order to show cause was issued and, after further briefing, an evidentiary hearing was

---

[1]    All further statutory references are to the Penal Code unless otherwise stated. Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6.  (Stats. 2022, ch. 58, § 10.)  There were no substantive changes to the statute. We will cite to the current section 1172.6 throughout this opinion.

[2]    Codefendants Angel Delvillar, Phillip Lopez, Jr., and Hector Joaquin Rocha, Jr. filed a separate appeal; Delvillar and Rocha's convictions were affirmed; Lopez's conviction was conditionally reversed and the case remanded to the juvenile court for further proceedings and for the purpose of making a determination in light of *People v. Franklin* (2016) 63 Cal.4th 261.

2.

held May 10, 2022. Following the evidentiary hearing, the trial court denied Cerpa's petition on June 29, 2022, finding that he was both a direct aider and abettor who had intent to kill and a major participant in the robbery who acted with reckless indifference to human life and, as such, was ineligible for relief.

Cerpa appeals the denial of the petition, arguing that there was insufficient evidence to support a finding (1) of direct aiding and abetting in the murder and (2) that he was a major participant who acted with reckless indifference. He also contends, (3) pursuant to Evidence Code section 352.2, that the trial court erred at the hearing by admitting into evidence a rap video in which Cerpa appeared.

Having considered Cerpa's arguments, we reject his contentions. Moreover, because the record of conviction establishes Cerpa's ineligibility for resentencing, we affirm.

## STATEMENT OF THE FACTS[3]

This case involves a March 24, 2010, home invasion robbery that resulted in the shooting death of Julio Jimenez. The perpetrators of the robbery were Norteño gang members Domingo Becerra, Aquiles Virgen, Daniel Flores (who each pleaded guilty before trial and testified for the prosecution) and codefendants Rocha, Lopez, and Delvillar. Becerra was the perpetrator of the murder. Cerpa, known as "Joker," was not at the scene of the crime and was prosecuted as an aider and abettor.[4] The prosecution alleged Cerpa was a high-ranking gang member who participated in the planning of the

---

[3]     This statement of the facts is taken from our opinion filed March 20, 2019. (*People v. Cerpa* (Mar. 20, 2019, F073493) [nonpub. opn.].) We take judicial notice of the record in the appeal (case No. F073493) pursuant to Evidence Code section 452, subdivision (d).

[4]     Throughout the case, the various gang members were referred to alternately by name or by gang moniker. Aside from Cerpa, who we at times refer to as Joker when relevant, we refer to the remainder by name only to avoid confusion.

robbery from his home in Keyes, and aided in the robbery by supplying the perpetrators with ammunition and masks.

*Testimony of Percipient Witnesses to the Crimes*

On March 24, 2010, after midnight, Isaias Pantoja and his two-year-old daughter were asleep on a bed in the living room of their home on Thrasher Avenue in Modesto. Pantoja had rented the house only three weeks earlier and did not know who lived there before he moved in. Pantoja was not a drug dealer, and no one had come by asking to buy drugs. When he heard voices, shouting as if they were fighting or struggling, Pantoja got up and looked out the window and saw five or six people wearing blue and black clothing, their faces covered with handkerchiefs or towels. Four or five of them were carrying weapons—pistols and a rifle—and a strange SUV or truck was parked in the driveway. Three other people were being led to the backyard, including a man who was being dragged and hit or pushed. Pantoja called 911 on his cell phone.

While on the phone, Pantoja heard the kitchen window and several other windows in the back of the house break. His daughter was still asleep. Three people came into the kitchen through the window. Pantoja was trying to hold them back while on the phone giving police directions. Pantoja was asking for someone who spoke Spanish when he heard a gunshot. Later, Pantoja saw a bullet hole in the kitchen ceiling. Pantoja saw two guns inside the house. He heard two gunshots—one outside and one inside the house. One of the men in the house hit Pantoja with his pistol, grabbed him and demanded, in English, "Where is the money?" Pantoja suffered a scratch and bruise on the bridge of his nose and a dark mark under his left eye from being hit with the butt of the pistol. Pantoja did not see the person who shot the gun inside the house, but it may have been the person who struck him.

Pantoja had approximately $110 in his wallet and $600 or $650 in his pants pocket he was going to send to his wife in Mexico. The men took the wallet out of his pants. Pantoja thought the men were in the house for three to five minutes. When they heard

4.

sirens, they took off through the back of the house. Pantoja did not see what happened in the backyard.

While Pantoja was in the house, before shots were fired, the people being led from the SUV to the backyard were Corina Vargas, Julio Jimenez and Florentine Soto. Pantoja did not know them.

According to Vargas, near midnight on March 23, 2010, she was with her friend Soto, walking to the house on Thrasher to get methamphetamine. As they were walking, Soto waived down Jimenez, driving a green SUV; Vargas did not know Jimenez. Soto spoke to Jimenez in Spanish, and Vargas and Soto got into the car. It took less than five minutes to drive to the house on Thrasher, where Jimenez parked the SUV in the driveway.

Suddenly, the SUV was surrounded by people wearing black with their faces covered, demanding that the occupants get out of the vehicle. Soto and Jimenez got out; Vargas stayed in the backseat with her purse. One or two people got into the front seat of the SUV, threatened Vargas and told her to get out of the car and go into the backyard. Vargas saw one of the people with Jimenez at the front doorstep of the house, trying to open the door with his keys. Vargas heard Jimenez say, "No. No. It's not my house." Two of the men led Vargas to the backyard and told her to get on the ground, where she laid on her stomach, scared for her life. One man stayed with Vargas, about six feet from her with his gun pointed at the ground. He told Vargas to shut up and she would not get hurt. Someone took Vargas's purse while she was on the ground.

While Vargas was still on the ground, she heard two or three gunshots from inside the house, windows breaking, an infant crying, yelling, and then a siren. People fled the house, yelling, "the cops are coming." People were telling Jimenez, who was standing 20 feet from Vargas, to get down. Within seconds, someone shot him. Vargas heard four or five shots rapidly fired, like the shots from one gun. Vargas only saw the back of the person who shot Jimenez.

5.

After it was quiet, Vargas got up and walked home. She did not call the police, as she was scared. The following day, a detective came to her house and brought her purse and identification card.

At about half-past midnight, a police officer was dispatched to the house on Thrasher. In the driveway was an SUV. Pantoja was in the house with his daughter; he was shaking and had been injured. Some blood spatter was found in the house. In the backyard, the officer found Jimenez, lying on the ground unresponsive, with a wound to the back of his head.

*Accomplice Testimony*

Becerra, Flores and Virgen each testified against defendants, including Cerpa, at trial. Becerra testified in exchange for a 25-year-to-life sentence. Virgen was attacked while in custody awaiting trial, prompting him to agree to testify in exchange for a 15-year-to-life sentence. Flores, while in juvenile hall awaiting trial, also agreed to testify in exchange for a 10-year sentence and two strikes. The following is their version of the events in question.

*Accomplice Flores*

Flores joined the Norteño gang at age 14, and had attended several parties at the house in Keyes, where Cerpa and Roberto Osequeda lived. Flores considered the Keyes house to be a gang "headquarters" where gang members would meet, party and plan crimes.

Flores believed Cerpa was part of the "regiment", a group of Norteños that commits crimes to help prisoners on behalf of Nuestra Familia. In early 2010, Flores was directed by Joe Ramirez and Johnny Montalvo to participate with other gang members in an armed robbery; as instructed, he brought the proceeds from the robbery back to the Keyes house. The two ordered Flores to do the same for another robbery as well, this time from a taco truck. Cerpa was present when Flores brought the proceeds of both robberies back to the Keyes house.

On March 23, 2010, Flores received a call from Montalvo, telling him to report to the Keyes house. Montalvo told Flores that Rocha would pick him up, which he did in a black Jeep. Flores brought his nine-millimeter, as requested by Montalvo; Flores's brother, Juan, who also came along, brought a shotgun. There were 12–15 individuals in the house when they arrived, including Becerra, Lopez and Rodriguez. Cerpa was in the garage with Montalvo and Ramirez. Rocha joined them. Flores later testified he did not see Cerpa in the garage, but saw him at some point in the living room.

Montalvo told the group assembled in the kitchen that they would commit a home invasion robbery of a drug house on Thrasher Avenue and were to bring the drugs and money back to the house. Ramirez selected the ones to go on the mission and put Becerra in charge. Flores saw two revolvers and ammunition on the table. John Rivera told the group not to shoot anyone unless they had to, and warned them not to kill anyone.

Flores did not personally see Cerpa participate in any planning activity, but believed he must have been in on the plan because he was in a room in the house where the robbery was planned by gang leaders.

Six gang members left in Rocha's Jeep: Rocha (the driver), Flores, Becerra, Virgen, Lopez and Delvillar; Becerra was in charge. They wore masks made from ripped up shirts someone gave them at the house before they left. Flores carried his nine-millimeter; there was also a shotgun, a .38-handgun and a .357-handgun in the car. Three others (Rivera, Montalvo, and a third person) followed in a red car. They drove to the Thrasher house, stopping for gas along the way.

There was an SUV parked at the Thrasher house when they arrived. The gang members pulled the three occupants from the SUV and took the female's purse. They then took the three into the backyard and made them lie on the ground. Flores guarded the three while the others forced entry into the house. Lopez remained in the front of the house as a "lookout."

7.

When Flores heard gunshots from inside the house, Jimenez got up and tried to jump the fence. Flores stopped him and made him get back on the ground. Becerra came out of the house and shot Jimenez.

When the gang heard sirens, they all ran back to the Jeep and Rocha drove off. The red car was behind them. As police followed them, Becerra collected the guns and threw them out the window. Flores hid his nine-millimeter under the seat. The Jeep was stopped by a spike strip. Everyone fled; Flores was apprehended.

*Accomplice Virgen*

Montalvo called Virgen on March 23, 2010, and told him to come to the Keyes house because he needed help committing a robbery. Virgen had been to the Keyes house before and considered it a Norteño house. He recognized several fellow gang members there, but did not see Cerpa at the house that night, but had seen him at the house before.

Montalvo told the group gathered in the kitchen they would rob a drug house. Becerra and Montalvo brought guns into the room and handed them out. Ammunition was on the table. The gang used torn shirts and bandannas as masks. Montalvo told them not to shoot anyone, just scare them. They were supposed to get drugs and money and bring it back to the house.

Six of them left in a Jeep, while others followed in a red car. Montalvo said the red car would be used to crash into a police car as a diversion if there was a chase. They stopped for gas on the way.

An SUV was parked in the driveway of the Thrasher house when they arrived. They pulled the occupants out of the SUV, took them to the rear of the house and had them lie on the ground. Two or three gang members went into the house through broken windows. When Virgen heard gunshots from inside the house, and then sirens in the distance, he ran with the others and got into the Jeep. As he ran, he heard additional gunshots coming from the backyard.

8.

The Jeep with all six of them drove away.  As they were being chased, they threw guns and masks out the windows.  The car stopped when it drove over a spike strip.  Everyone ran; Virgen was found and arrested.

*Accomplice Becerra*

Becerra testified he was a Norteño gang member since the age of 10, and by the age of 16, had already committed 20 drive-by shootings.  He had been a paid informant for the Modesto Police Department since August 2009; his fellow gang members were unaware he was an informant.

Becerra knew Osequeda, who introduced him to Cerpa.  Osequeda and Cerpa lived together.  Osequeda and Cerpa told Becerra there was nobody who had control ("the keys") of the East Side and offered Becerra temporary control of 15 Norteños.  His chain of command went from Cerpa to Rivera to Ramirez, who was the boss of the regiment. Becerra testified that Cerpa had authority over lower-ranking members.

On March 23, 2010, Cerpa called Becerra to tell him he received a written note smuggled from Becerra's brother in jail, and that Ramirez wanted to talk to him about it.  Becerra drove his mother's red Toyota sedan to the house in Keyes, where he and Osequeda waited for Cerpa to come home from work.  When Cerpa arrived, he and Becerra talked about various things, including a home invasion that was going to happen that night.  When Ramirez and Montalvo arrived at the house, Ramirez officially gave Becerra the "keys" to the East Side.

Becerra, Montalvo and Delvillar left for a short while and then returned to the house with Rivera around nightfall.  A conversation took place, which included Cerpa, Osequeda, Ramirez, and Palomar Rodriguez.  Cerpa had a plan for a home invasion robbery in Merced, but Becerra, who had just received "the keys" and wished to boost his status, said he knew of a drug house on Thrasher Avenue they could hit instead.  The plan was agreed on and other gang members were called and told to come to the house on Keyes.

Becerra and Montalvo then went to see someone named Butch, who knew about the drug house and provided them with guns and a map to the house. Becerra and Montalvo then returned to the house on Keyes where a group of gang members was now assembled. Ramirez was the chief planner who put Becerra in charge and selected the others to go along. Ramirez, Montalvo, and Becerra gave instructions to the group and Becerra handed out guns to the group. Cerpa and Montalvo went into Cerpa's room and retrieved ammunition (.357 bullets) for the guns from a drawer. Becerra was also present in the room. Cerpa also retrieved clothing from his closet for them to make masks.

Montalvo instructed Becerra to leave his wallet with his student ID and driver's license on the kitchen table at the Keyes house, because he did not want to take the chance of him leaving it at the crime scene.

Becerra left with Rocha, Flores, Virgen, and Lopez in Rocha's Jeep. Ramirez, Rivera, Cerpa and Montalvo came up with a last-minute plan to use Becerra's mother's red car as a second vehicle, and Montalvo, Rivera, Santos Cardenas, and Delvillar rode in that vehicle.

When they arrived at the Thrasher house and saw an SUV parked in the driveway, Becerra ordered the others to pull the three occupants from the vehicle and to take the woman's purse. Becerra assumed one of the three lived there and would have the keys to open the front door. When that did not work, he told the others to take the three into the backyard. He instructed Flores to have them lie on the ground.

Virgen and Rocha broke windows and entered the house while Becerra searched an outbuilding. When Becerra came out, he saw Jimenez trying to jump the fence. Flores and Becerra both told him to get down. Becerra was angry because he told Flores to watch them and he thought Jimenez was playing him for a fool. Becerra shot Jimenez three times.

They all ran back to the Jeep and Rocha drove off. When a police car started to chase them, Becerra told everyone to hand over their guns and masks and he threw them

10.

from the window.  The Jeep finally came to a stop in an alley after the tires hit a spike strip.  Everyone fled.  When Becerra was captured, he asked to speak to Detective Hicks.

*Rodriguez's Statement*

In November 2011, Rodriguez was interviewed regarding an attack on Virgen, while Virgen was in custody.  A portion of Rodriguez's statement was introduced, via video recording, in which he stated Becerra went to Ramirez and asked to join the regiment.  Ramirez, in turn, asked other gang members if they should allow Becerra to join.  Although others advised against it, it was decided to give Becerra a chance.

Rodriguez was at the Keyes address when Becerra suggested a home invasion robbery where they could get crystal methamphetamine, weed, and cash.  Ramirez gave Becerra the green light and said he could be part of the regiment and would be given control of the Eastside.  Ramirez told Rivera and Montalvo to make sure the job got done and to supply them with guns.

*The Arrests*

After a car chase, Virgen was arrested in a backyard on Parklawn Avenue.  He had a cell phone and a small amount of cash on him.  Becerra, who was stuck between a detached garage and the fence of the same backyard, surrendered within 10 to 15 seconds after an officer shone a light on him.  Flores was discovered, wearing all black, underneath a minivan in the front yard of the house.  Rocha, wearing a black sweatshirt and tan pants, was found hiding behind a fence a few houses down.  He had a blood stain on his left knee and dried blood on his left palm.  Lopez, wearing torn black clothing, was arrested in the same block of Parklawn.  The Jeep was found in the alley with the passenger side door open.

*Autopsy*

An autopsy of Jimenez showed tool marks on his forehead matching the pattern from the gun barrel of a .357 recovered by police.  He had bruising and tearing on the

back of his head from being hit with the butt of a gun.  He died of two gunshot wounds to the back.

*Other Physical Evidence*

A videotape from a few minutes after midnight on March 24, 2010, showed an SUV and a red passenger car pulling into a gas station, gassing up and then leaving.  A videotape of the Thrasher house made on March 24, 2010, showed, inter alia, one bullet hole in the kitchen ceiling and another in the ceiling of the room off the kitchen.  A wallet was found next to a pair of pants in the hallway of the second bedroom, with $775 in cash in a pocket.  Several windows in the house were broken.  The backyard fence was kicked out.

Detective Michael Hicks was notified of the event at 1:17 a.m.  After visiting the Thrasher site, he went to Parklawn Avenue, where he contacted Becerra, whom he knew.  Becerra told Hicks, "I fucked up, Hicks."  Becerra then helped Detective Hicks find evidence along the chase route—a single barrel shotgun, broken into three pieces, with a live round; red cloth; two loaded .357 revolvers; and a .38-handgun.  Other items later recovered along the route included clothing, live shotgun shells, a black cotton glove, a white cloth, and a black latex glove.

The red Toyota was later found parked at the home of Becerra's mother.  A wallet belonging to Delvillar was found in the glove box.  A search of the Jeep, on March 24, 2010, revealed a Taurus nine-millimeter semi-automatic firearm loaded with 14 rounds in the magazine underneath the driver's seat.

A March 28, 2010, search of Cerpa's room in Keyes house revealed six jacketed hollow point aluminum casing .357 bullets in a shirt pocket in the bedroom's closet.  Also found in the home were handguns containing fired and unfired rounds, of the same make and type as the shells found in revolvers recovered from the chase route.  Also in the room were red shirts and a K-Swiss shoebox.  Cerpa was detained during the search,

and subsequently arrested. The house search also revealed latex gloves matching those worn by the perpetrators, as well as Becerra's wallet.

*Defense*

*Cerpa's Defense*

Detective Sean Martin testified that a SWAT team cleared the Keyes residence before it was searched and may have moved items before photographs were taken. Photographs of Cerpa's bedroom and the closet may not have necessarily reflected the location of items when they were originally found.

*Rocha's Defense*

Rocha testified in his own defense. In his testimony, he placed most of the blame on the other participants and claimed he was not guilty because he was merely following orders. Rocha testified he did not know what Cerpa's status was in the gang, but that Cerpa associated with a lot of gang members and was always present at parties at the Keyes house. Rocha thought Osequeda, Montalvo and Cerpa were all living at the Keyes house at the time of the robbery.

Montalvo called Rocha on the night of March 23, 2010, and told him to pick up other named gang members and bring them to the Keyes house. Once there, Rocha went into the garage and met Cerpa and Rivera, and the three drank beer and exchanged small talk. Cerpa and Rivera then left, saying they had something to discuss, and Rocha was left in the garage alone. He was later told he and his Jeep were needed for a robbery. When he went into the house, he saw 12 to 15 people, including all of his codefendants except Cerpa. Rocha testified that Montalvo brought guns into the room from somewhere down the hallway and grabbed clothes from a laundry bin in the kitchen for masks.

## HEARING ON THE PETITION

At the hearing on the petition, the People argued that Cerpa was convicted of murder because he armed six gang members with guns and ammunition and directed

13.

them to go to a rival gang member's drug house to steal drugs and money and bring them back to the gang.  The People argued that, while Cerpa was not present at the murder of Jimenez, he was a direct aider and abettor and would "still be liable for murder under Penal Code [section] 189 [subdivision] (e)(2), or alternatively … be convicted of murder under Penal Code [section] 189 [subdivision] (e)(3) as a major participa[nt] who acted with reckless disregard to human life."

Felix Roman, an investigator with the district attorney's office, testified for the prosecution that he obtained a recording of a rap video entitled *Norte Lado* from Detective Martin.  He also viewed the same video on YouTube.  Roman could not say when the video was made, but it was a professionally produced video depicting a performer singing and rapping in a mix of Spanish and English about Norteño gang lifestyle.  There are references in the lyrics to firearms and shootings.  A crowd dressed in gang attire is assembled behind the performer, some making gang signs, and brandishing firearms.

During the video, certain crowd members have speaking parts, Cerpa being one of them.  During his speaking part he chants the following:

> "That is what we do, Homie.  Stay united, Homie.  All day, every day, Homie.  Fuck a Scrap.  Fuck a DO, Homie.  Stay active, Homie.  You know what I mean?  That is what we do, Homie, stay active.  Fuck a fake ass — pardon — Bitch "N."  You  know what I'm saying?  Real soldier …We stay active."

Roman testified that "scrap" is a derogatory name for a Southerner, a rival gang member, and "DO" stands for drop out.  "Staying active" means "doing what the gang asks you to do, following the rules of the gang, going out with fellow gang members to commit crimes or to follow the orders that are given to the gang members, which is why he refers to themselves as 'real soldiers.'"

Cerpa's counsel, who objected to the above mentioned video, argued that the "main issue in this case is whether or not someone who was not present at the crime can

14.

be a major participant in this, say, a robbery or some other crime, to sustain a murder conviction."

In its subsequent written ruling on the petition, the trial court reiterated that a jury found Cerpa and three codefendants guilty of, inter alia, the first degree murder of Julio Jimenez during the course of a robbery (§ 187, subd. (a)), and that Becerra personally discharged a firearm causing Jimenez's death.

The trial court's ruling noted the recent amendments to the natural and probable consequences doctrine to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless disregard to human life. The trial court noted further that the bill added three separate provisions to the Penal Code. First, section 188, subdivision (a)(3) was added, which required a principal to act with malice aforethought before he or she may be convicted of murder. Second, to amend the felony murder rule, section 189, subdivision (e) was added:

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

And finally, the bill added section 1172.6 to provide a procedure for those convicted of a qualifying offense to seek relief under the two ameliorative provisions above.

The trial court's ruling noted that, at the evidentiary hearing, it was an independent fact finder and the parties could rely on the record of conviction, or offer new or additional evidence. The ruling stated that the trial court could also consider the procedural history of the case recited in any prior appellate opinion, jury instructions, as

15.

well as the trial transcript. It noted that the prosecution bore the burden to prove beyond a reasonable doubt that Cerpa was ineligible for relief, and it was the trial court's duty to decide as a factual matter whether Cerpa committed murder under the current law.

The ruling stated that Cerpa established prima facie eligibility for relief, and an order to show cause evidentiary hearing convened on May 10, 2022. At the hearing, the court took judicial notice of the clerk's transcript, the reporter's transcript on appeal, the abstract of judgment, and the exhibits attached to the People's brief in response to the order to show cause filed on July 14, 2021. In addition to the record of conviction, the court considered exhibit T, a Norte Lado video. Cerpa offered no evidence.

As stated in its ruling, the People did not claim Cerpa was the actual killer, but instead argued Cerpa would still be convicted of murder because he aided and abetted the actual killer with the intent to kill, and that he was a major participant in the robbery who acted with reckless indifference to human life.

The trial court noted that subdivision (e)(2) of section 189 described aider and abettor liability for murder as a person who is not the actual killer but can presently be convicted of murder if he or she, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

In its ruling the trial court stated that the uncontroverted evidence established that Cerpa was a leader of the Norteño gang, and other individuals who participated in the crime deferred to and feared Cerpa. By summoning defendant Becerra to his house to plan an armed robbery Cerpa solicited the crime and by his status, "he commanded it." Cerpa "supplied his house, a plan, several of the guns, ammunition for the murder weapon itself, and latex gloves and clothing to mask detection. The pictures and testimony revealed that [Cerpa's] house was a gang headquarters. The plan included the use of five loaded guns to steal drugs during a home invasion robbery." The ruling found the guns were brought because of the inherent dangerousness of a home invasion robbery

16.

of a rival gang drug house, and Cerpa "knew the subjects of the robbery would protect their drugs and dignity with a level of force at least matching that orchestrated" by Cerpa. According to the trial court, a shoot-out "was contemplated and expected, and death was an obvious consequence." The trial court concluded that the People established "[b]eyond a reasonable doubt" that Cerpa "aided the perpetrator's commission of a life-endangering act while personally harboring the mental state of implied malice as he knew his conduct endangered the life of another and acted with a conscious disregard for life."

In addressing the People's argument that Cerpa was also not eligible for resentencing because he was a major participant who acted with reckless indifference to human life, the court stated that, in determining whether an individual is a "major participant" it considered the following factors: (1) what role Cerpa had in planning the criminal enterprise that led to one or more deaths; (2) what role Cerpa had in supplying or using lethal weapons; (3) what awareness Cerpa had of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; (4) whether Cerpa was present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death; and (5) what Cerpa did after lethal force was used.

Answering those factors, the trial court determined Cerpa was a major participant in the robbery. The trial court stated the home invasion robbery plan was hatched out of Cerpa's home, a gang headquarters; Cerpa was a high-ranking member of the gang, and the crime was designed to benefit Cerpa's gang; Cerpa supplied ammunition, face covering material and several of the guns used during the home invasion robbery; the offense was orchestrated by Cerpa in response to direction communicated through a "wila" from incarcerated high-ranking members of the gang; Cerpa knew that robbing a known drug dealer was a dangerous and inherently violent crime and accordingly ensured all perpetrators were armed. While Cerpa was not at the scene, the trial court found that Cerpa clearly had authority over everyone who was there. The ruling surmised that, had

17.

Cerpa wanted to call off the home invasion robbery, he could have, and those who arrived at the purported rival gang house would have been obligated to retreat. The trial court noted that accomplice Becerra called Cerpa after the murder, while Becerra was being pursued by police, and Cerpa did nothing to mitigate the harm done. The trial court found that, in looking at the totality of the circumstances, Cerpa was a major participant.

The trial court also found Cerpa acted with reckless indifference to human life. It noted factors showing a reckless indifference to human life included: (1) a defendant's knowledge of weapons and the number of weapons; (2) defendant's physical presence at the scene; (3) duration of the felony; (4) defendant's knowledge that coparticipants are likely to kill; (5) defendant's effort to minimize risks of violence, and defendant's conduct in use of lethal force, citing *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617).

Again, the trial court found Cerpa ensured that all accomplices were armed with loaded weapons by supplying several of the weapons as well as the ammunition for the gun that was fired. The trial court found that, while Cerpa was not present at the scene, he had authority over those who were. The trial court described the crime as "involving many actors and many unknowns" and "it was not brief and therefore increased the opportunity for things to go wrong." The ruling found that, considering the violent culture of this gang and Cerpa's position in the gang, the fact that the crime was committed by other gang members who were taught to hate rival gang members, and the inherently dangerous circumstances of a home invasion robbery, Cerpa had knowledge that coparticipants were likely to kill. And instead of minimizing the risks of danger, the ruling found that Cerpa enhanced the danger by ensuring fellow gang members were all armed with loaded weapons. The trial court likened Cerpa to "a commander sending his troops to battle," noting he "understood casualties were to be expected."

18.

The trial court stated that it's ruling was consistent with the jury's verdict, in that the jury understood Cerpa was not at the scene of the murder, but still found him guilty of section 187, subdivision (a) and that the murder was committed in the perpetration of a robbery. The jury also found that Cerpa was a principal in the commission of the robbery.

The trial court concluded that the evidence established that Cerpa is ineligible for relief and stated,

> "With the intent to kill, he aided and abetted in the commission of murder in the first degree. Additionally, he was a major participant in the underlying robbery and acted with reckless indifference to human life. He could presently be convicted of murder under the law as amended by Senate Bill [No.] 1437. [¶] Accordingly, petitioner Cerpa's [p]etition for [r]esentencing is denied and he is remanded to the custody of the sheriff for delivery to CDCR forthwith."

## DISCUSSION

I.  IS THERE SUBSTANTIAL EVIDENCE TO SUPPORT THE SUPERIOR COURT'S DENIAL OF CERPA'S SECTION 1170.9 PETITION?

### A. *Senate Bill No. 1437 and Standard of Review*

Senate Bill No. 1437 took effect on January 1, 2019 (2017-2018 Reg. Sess.). In short, Senate Bill No. 1437 and subsequent amendments limited accomplice liability for murder and attempted murder under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates those crimes. (See generally *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843.)

As relevant here, Senate Bill No. 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) the person was a major participant in the underlying felony and acted with reckless

19.

indifference to human life, as described in section 190.2, subdivision (d). (*People v. Gentile, supra,* 10 Cal.5th at p. 842.)

Senate Bill No. 1437 also added section 1172.6, which created a procedure whereby persons convicted of murder or attempted murder under a now-invalid theory may petition for vacation of their convictions and resentencing. A defendant is eligible for relief under section 1172.6 if the defendant (1) was charged with murder or attempted murder under a now invalid theory, (2) was convicted of murder or attempted murder, and (3) could no longer be convicted of those crimes due to changes to the law effectuated by Senate Bill No. 1437. (§ 1172.6, subd. (a).) If a petitioner makes a prima facie showing of entitlement to relief, the trial court shall issue an order to show cause (§ 1172.6, subd. (c)) and hold an evidentiary hearing at which the prosecution bears the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder" under the law as amended by Senate Bill No. 1437 (§ 1172.6, subd. (d)(3)). The parties may offer new or additional evidence at the evidentiary hearing. (*Ibid.*) A "finding that there is substantial evidence to support a conviction for murder" is insufficient to meet this required showing. (*Ibid.*) The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory of murder. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

On appeal, we review the trial court's findings after an evidentiary hearing for substantial evidence. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 591; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) Under that standard of review, we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

B. *Sufficiency of the evidence Cerpa was a major participant in the underlying felony who acted with reckless indifference to human life.*

Cerpa contends that the trial court erred by denying his section 1172.6 petition because there was insufficient evidence that he was a major participant in the robbery and acted with reckless indifference to human life. We disagree.

What it means to be a major participant in a crime who acts with reckless indifference to human life has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.) In contrast, *Tison, supra,* at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison. The defendants gave them guns, and the group later kidnapped a family of four. The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager. (*Id.* at pp. 139-141.) The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Tison, supra,* at p. 152; see also *id.* at pp. 157-158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th 522, our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements. *Banks*, *supra,* at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in

21.

planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

In *Clark,* the court then turned its attention to "reckless indifference to human life." Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark, supra,* 63 Cal.4th at p. 616.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.)  Recklessness has both a subjective and an objective component. (*Ibid.*)  Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

Here, Cerpa was a major participant and did not play a peripheral role in the robbery that led to Jimenez's death. In its ruling, the trial court noted that Cerpa was a feared leader of the Norteño gang who was actively involved in every element of the crime: he planned the robbery in his own home; he personally recruited and armed Becerra (the shooter); he provided masks and gloves to his subordinate gang members; and he supplied guns and ammunition to the gang members. As stated by the trial court, although Cerpa "was not at the scene, it is clear he had authority over everyone who was there. If he wanted to call off the home invasion robbery, he could have, and those who arrived at the purported rival gang house, would have been obligated to retreat." Substantial evidence supports the trial court's finding that Cerpa was a major participant in the crime.

As for evidence that Cerpa acted with reckless indifference to human life, the trial court again noted that, while Cerpa was not present at the scene, he had authority over those who were. He obviously knew weapons would be used during the felony as he supplied several of the guns as well as the ammunition. The trial court also noted that Cerpa had the knowledge that his subordinate gang members were likely to kill, considering the violent culture of the gang, Cerpa's position within the gang, the fact that the crime was committed "by other gang members who were taught to hate rival gang members, and the inherently dangerous circumstances of a home invasion robbery .…" The trial court described Cerpa as "a commander sending his troops to battle" who "understood casualties were to be expected."

Reviewing the totality of this evidence, it was sufficient to support the trial court's conclusion that Cerpa was a major participant in the robbery who acted with reckless indifference to human life.[5]

II.      WAS THE MUSIC VIDEO PROPERLY ADMITTED AT THE EVIDENTIARY HEARING?

A music video containing Cerpa was admitted during the evidentiary hearing.  In the music video, Cerpa rapped about hatred towards rival gang members.[6]  Cerpa now contends this was prejudicial error pursuant to Evidence Code section 352.2.  We disagree.

The evidentiary hearing on Cerpa's petition took place on May 10, 2022.  Evidence Code section 352.2, became effective January 1, 2023, and was enacted to protect freedom of speech and guard against racial stereotyping, and requires trial courts to give special scrutiny to evidence in the form of a "creative expression" — such as song

---

[5]      The trial court also found that Cerpa, "with the intent to kill … aided and abetted in the commission of murder in the first degree."  Because we conclude there was sufficient evidence to support the trial court's finding that Cerpa was a major participant in the robbery who acted with reckless indifference to human life, we do not address whether there was sufficient evidence he was also a direct aider and abettor.

[6]      The same music video had been offered at Cerpa's original trial, but was not admitted because of the possible prejudice to the three other codefendants who were not in the video.

lyrics, art or film — offered against the defendant in a criminal prosecution. (Stats. 2022, ch. 973, § 2, eff. Jan. 1, 2023.)[7]

Cerpa argues Evidence Code section 352.2 applies retroactively to his case and would preclude the music video that was admitted against him. But in respondent's view, the statute is prospective only.

Case law is divided as to whether Evidence Code section 352.2 applies retroactively to cases like Cerpa's, which are not yet final for purposes of direct appeal. (Compare *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2023, S279081 [applies retroactively] with *People v. Ramos* (2023) 90 Cal.App.5th 578, review granted July 12, 2023, S280073 [does not apply retroactively].) However, even if it does,

---

[7]    Evidence Code section 352.2 provides: "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code] [s]ection 352, shall consider, in addition to the factors listed in [Evidence Code] [s]ection 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] [s]ection 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings. [¶] (b) If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony. [¶] (c) For purposes of this section, 'creative expression' means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media. [¶] (d) The question of the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to [Evidence Code] [s]ection 402. The court shall state on the record its ruling and its reasons therefor."

25.

reversal would not be required here because any error in admitting the music video at Cerpa's evidentiary hearing was harmless under *People v. Watson* (1956) 46 Cal.2d 818. "[S]tate law error in admitting evidence is subject to the traditional *Watson* test," whether it is reasonably probable the result "would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

In admitting the music video at the evidentiary hearing, the trial court ruled, over objection, that it would admit the video as it was relevant on the issue of intent and that its probative value was not outweighed by its prejudicial effect. The trial court stated it would disregard anything in the video that was not relevant to the issue of intent. The theme of the music video, committing acts of violence to maintain gang lifestyle, was properly admitted to show Cerpa's state of mind regarding gang crimes. Cerpa's intent behind the robbery was highly relevant to the charged offenses.

Moreover, while the purpose of Evidence Code section 352.2 was intended to guard against the potential for stereotyping, the music video here was not shown to a jury but only to the trial court, the sole factfinder in this hearing. We presume trial court judges are unbiased and capable of discriminating between proper and improper use of evidence. (Evid. Code, § 664; *Hosner v. Skelly* (1946) 72 Cal.App.2d 457, 462 ["Judicial tribunals, proceeding within their proper jurisdiction, are deemed to have acted rightly, impartially and honestly."].)

The music video here was cumulative and merely constituted a visual representation of all the evidence at trial about gang culture and Cerpa's particular gang. There is no reasonable probability that the trial court would have found differently had the music video been excluded at the evidentiary hearing. In its lengthy and detailed order denying relief, the trial court referred only once, in passing, to the music video, stating it was "considered," but it did not refer to it in making its factual or legal findings.

In light of all these considerations, it is virtually inconceivable Cerpa would have obtained a more favorable verdict had the music video been excluded from his hearing on the petition.  Its admission into evidence was, at most, harmless error.

## DISPOSITION

The order denying Cerpa's section 1172.6 petition is affirmed.


                                               FRANSON, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.